# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **WESTPORT INSURANCE** | : | |
| **CORPORATION,** | : | |
| **Plaintiff,** | : | **Case No. C2-05-1152** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **WARD D. COFFMAN, III, et al.,** | : | **Magistrate Judge King** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on a Motion for Partial Summary Judgment of Plaintiff Westport Insurance ("Westport") and the Cross Motion for Summary Judgment of Defendant Ward D. Coffman ("Coffman"). Certain issues presented by the Motions have been mooted by the settlement of the underlying class action, *Foster v. D.B.S. Collection Agency*, Case No. 2:01 CV 514 (the "Class Action"). However, one issue remains to be decided by the Court: whether the Class Action complaint and the cross-claim in the Class Action against Coffman brought by Kathy Dickerson ("Dickerson") and D.B.S. Collection Agency ("DBS") (the "Malpractice Claim") constitute (1) a single claim under a single policy with a single $500,000 per-claim limit of liability or (2) two separate claims under two separate policies with two separate $500,000 per-claim limits of liability. For the foregoing reasons, the Court **GRANTS** Plaintiff's Partial Motion for Summary Judgment on the remaining issue and **DENIES** Defendant's Motion for Summary Judgment on the remaining issue.                    .

## II. BACKGROUND

## A. Factual Background

This case is an insurance coverage dispute whereby Westport seeks a declaratory judgment regarding the extent of its obligations under insurance policies it issued to Coffman and his firm, Coffman Law Offices. This cases arises out of the Class Action, in which Coffman was a defendant. In the Class Action, a cross-claim, which included the Malpractice Claim, was filed by co-defendants, DBS and Dickerson. In the Malpractice Claim, Dickerson seeks damages for alleged harm caused by Coffman's legal malpractice.

### 1. The Class Action

The Class Action, brought by the named plaintiffs (the "Fosters") and the class members, was based on the following allegations. DBS is an unincorporated proprietorship. As an attorney for DBS, Coffman handled several DBS transfers of ownership and the right to use the fictitious name "D.B.S. Collection Agency." Each time, however, Coffman failed to register the transfer of ownership of DBS and the right to use the fictitious name with the secretary of state. Coffman also regularly signed and filed pleadings to commence and to maintain civil actions on behalf of DBS for the purpose of collecting consumer debts allegedly owed third parties.

Dickerson, acting on behalf of DBS, obtained an illegal attachment of the Fosters' bank account and on January 25, 2001, Dickerson appeared before the Zanesville Municipal Court on behalf of DBS and opposed releasing the illegal attachment on the bank account. On February 23, 2001, the municipal court heard evidence on the Fosters' motion to vacate the default judgment taken against them, and Coffman appeared as counsel for DBS and Dickerson. Dickerson admitted never registering her ownership or use of the fictitious name "D.B.S.

Collection Agency" with the secretary of state, and that Mary Jane Slaughter, dead two years previously, remained the legal registrant and owner. Nonetheless, DBS, Dickerson, and Coffman refused voluntarily to dismiss and/or to vacate the debt collection judgment taken against the Fosters. On March 28, 2001, the municipal court ordered the January 4, 2001 default judgment vacated because at the time judgment was entered, DBS and Dickerson lacked standing to commence or maintain a civil action under the name "D.B.S. Collection Agency" due to the lack of proper registration.

### 2. The Cross-Claim

The cross-claim brought by co-defendants, DBS and Dickerson, in the Class Action was based on the following allegations. Coffman was the lawyer for Dickerson and DBS, and he breached his duties by: representing both parties in the purchase of DBS without informing Dickerson of the potential for conflicts of interest; failing to register the trade name "D.B.S. Collection Agency" following Dickerson's purchase of the company; and failing to advise Dickerson to obtain assignments from creditors prior to filing suit. The cross-claim contained two counts against Coffman: the Malpractice Claim and the contribution and/or indemnification claim.

### 3. The Westport Policies

Westport issued a claims-made Customized Practice Coverage policy to Coffman Law Offices effective for the period from December 12, 2000 to December 12, 2001 ("the 2000-01 Policy"). The Class Action was filed while the 2000-01 Policy was in effect. Westport also issued a claims-made Customized Practice Coverage policy to Coffman Law Offices effective for the period from December 12, 2002 to December 12, 2003 (the 2002-03 Policy"). While the

2002-03 Policy was in effect, the cross-claim was filed by DBS and Dickerson.

The 2000-01 Policy and the 2002-03 Policy (collectively the "Policies") define "Claim" as "demand made upon any INSURED for LOSS as defined in each of the COVERAGE UNITS." The Policies define "Wrongful Act" to include:

> [A]ny act, error, omission, circumstance, PERSONAL INJURY or breach of duty in the rendition of legal services for others in the INSURED's capacity as a lawyer, and arising out of the conduct of an INSURED'S profession as a lawyer, or as a lawyer acting in the capacity of an Arbitrator, Mediator or Notary Public. When an INSURED acts as an administrator, conservator, executor, guardian, trustee, escrow agent, receiver or other court-appointed fiduciary, the INSURED'S wrongful acts in such capacity shall be deemed to be the rendition of legal services for others in the INSURED'S capacity as a lawyer.

The Policies each contain the following provision in their General Terms & Conditions:

> X. MULTIPLE INSUREDS, CLAIMS AND CLAIMANTS
> The inclusion of more than one INSURED in any CLAIM or the making of CLAIMS by more than one person or organization shall not increase the limits of liability or the deductible. *Two or more CLAIMS arising out of* a single WRONGFUL ACT, as defined in each of the attached COVERAGE UNITS, or *a series of related or continuing WRONGFUL ACTS, shall be a single CLAIM*. All such CLAIMS whenever made shall be considered first made on the date on which the earlier CLAIM was first made arising out of such WRONGFUL ACT, as defined in the applicable COVERAGE UNIT, and all such CLAIMS are subject to one "Per Claim Limit of Liability" and deductible.

(emphasis added). The Policies do not define the phrase "series of related or continuing Wrongful Acts" or the terms "related" or "continuing" as used in the "Multiple Insureds, Claims and Claimants" provision (the "Multiple Insureds Clause").

### 4. Settlement of the Class Action

The Class Action was resolved through a settlement agreement (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Westport paid $450,000 on Coffman's behalf to settle all claims asserted against him in the Class Action by the Fosters and the class members. The Settlement Agreement also resolved the portion of the cross-claim by which

Dickerson sought contribution and/or indemnification from Coffman for any damages for which Dickerson might have been adjudged liable to the class members in the Class Action. However, the Settlement Agreement did not resolve the Malpractice Claim. Rather, Dickerson moved the Court to dismiss without prejudice the Malpractice Claim, and that motion was granted. The Malpractice Claim was subsequently refiled in the Court of Common Pleas of Muskingum County, Ohio, where it remains pending

## B. Procedural Background

This declaratory judgment action was filed on July 23, 2003, arising out of the Class Action filed on May 30, 2001. This case was stayed on February 28, 2008, pending approval of the Settlement Agreement that had been reached in the underlying Class Action. On July 30, 2008, the Settlement Agreement was approved by this Court and final judgment was entered. On October 14, 2008, Plaintiff Westport and Defendant Coffman filed a Joint Motion To Lift Stay by Plaintiff Westport Insurance and Defendant Ward D. Coffman. On October 21, 2008, this Court granted the Joint Motion to Lift Stay. Westport filed a Motion for Partial Summary Judgment on March 1, 2007. Coffman filed a Cross Motion for Summary Judgment on April 2, 2007. As the stay on this case has been lifted, these Motions for Summary Judgment are now before this Court.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).

A contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity. *GenCorp, Inc. v. Am. Intern. Underwriters,* 178 F.3d 804, 818 (6th Cir. 1999). The initial step, therefore, is to determine whether the contract is ambiguous, which is a question of law. *Id.* If the court finds no ambiguity it should proceed to interpret the contract at this summary judgment stage. *Id.* If, however, the court finds ambiguity, the court must examine extrinsic evidence. *Id.*

> The taking of this second step does not automatically preclude brevis disposition. Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations. On the other hand, if the extrinsic evidence relevant to the interpretation of an ambiguous contractual provision is contested or contradictory, summary judgment will often be inappropriate.

*Id.* at 818-19.

## IV. LAW AND ANALYSIS

Westport contends that the complaint in the Class Action and the Malpractice Claim constitute a single claim under the 2000-01 Policy, which has a $500,000 per-claim limit of liability. Westport also contends that the remaining per-claim limit of liability under the 2000-01 Policy is $50,000 since $450,000 of the 2000-01 Policy's $500,000 per-claim limit of liability was paid in the settlement of the Class Action.

-6-

Coffman contends that the complaint in the Class Action and the Malpractice Claim constitute two separate claims under two separate policies, each of which has a $500,000 per-claim limit of liability. Specifically, the complaint in the Class Action constitutes a claim under the 2000-01 Policy, and the Malpractice Claim constitutes a separate claim under the 2002-03 Policy, which has a separate $500,000 per-claim limit of liability. Coffman alleges that the complaint in the Class Action was for "debt-collection activities" whereas the Malpractice Claim is for "legal malpractice."

## A. Analysis of Policy Language

When interpreting an insurance policy, "words and phrases used in an insurance policy must be given their natural and commonly accepted meaning." *U.S. Fed. & Guar. Co. V. Lightning Rod Mut. Ins. Co.*, 687 N.E.2d 717, 719 (Ohio 1997); *see also Watkins v. Brown*, 646 N.E.2d 485, 487 (Ohio Ct. App. 1994) ("[c]ontract terms are to be given their 'natural and usual' meaning if they are not defined in the policy, unless it is clear from the policy that the parties intended to use some specialized or technical definition"). If provisions are susceptible to more than one interpretation, they "will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1380-81 (6th Cir. 1988). But this rule of construction in favor of the insured does not apply where policy language is "unambiguous or where ambiguity can be resolved through ordinary rules of interpretation." *Scott v. Am. Nat'l Fire Ins. Co., Inc.*, 216 F.Supp.2d 689, 693 (N.D. Ohio 2002). Furthermore, an ambiguity does not arise merely because the parties disagree regarding the interpretation of specific provisions. *TIG Ins. Co. v. Merryland Childcare and Dev. Ctr., Inc.*, No. 04-2666 B, 2007 WL 316571, at *3 (W.D. Tenn. Jan. 31, 2007).

## 1. Ambiguity

The initial determination the Court must make is whether the term "related" in the "Multiple Insureds Clause" is ambiguous. When deciding a state law contract issue, the Court applies the law of the state's highest court. *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 697 (6th Cir. 2006). If the state's highest court has not addressed the issue, the Court must attempt to ascertain how that court would rule if it were faced with the issue. The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the "majority" rule in making this determination. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999).

The parties do not point to any Ohio State Supreme Court or Ohio appellate court authority directly interpreting the term "related" in a professional liability insurance policy provision or similar contract, nor has this Court found any such authority. However, there is a Sixth Circuit case, interpreting Ohio law, dealing with a very similar provision, *A.C. Strip v. Home Ins. Co.*, 868 F.2d 181 (6th Cir. 1989). In *A.C. Strip*, the underlying lawsuit began as a claim by the United States against a mining company and two other defendants for recovery of civil penalties for violations of a statute. *Id.* at 183. The complaint was then amended to add an attorney who had served as a receiver for the company. *Id.* Later, the complaint was amended to add the attorney's law firm. *Id.* Following this, the two other defendants filed cross-claims against the attorney and the law firm. *Id.* The attorney and law firm notified their professional liability insurance carriers of the claims against them, but the insurance companies denied coverage and defense. *Id.* Thereafter, the attorney and law firm filed a third-party complaint

against the insurance carriers seeking a declaratory judgment that the carriers were obligated to defend and provide coverage for the claims. *Id.*

In that case, the multiple insureds clause stated, "Two or more claims arising out of a single act . . . or a series of related acts . . . shall be treated as a single claim." *Id.* at 189. That clause is almost identical to the "Multiple Insureds Clause" in this case. The *A.C. Strip* Court stated, that "the intent of the provision is to relate subsequent claims, based on an initial claim, back to the initial claim so that the insurer is not liable to the limits of the policy on both claims." *Id.* at 190. The Court also stated that "[t]he language of the multiple insureds clause is clear and unambiguous." *Id.* Therefore, the Court held that the later claim made against the law firm related back to the initial claim made against the attorney. *Id.* As the initial claim was made before the insurance policy was in effect, the claim against the law firm was not covered by the insurance policy. *Id.*

As Sixth Circuit precedent interpreting Ohio law, *A.C. Strip* is controlling for this Court. Coffman asserts that the declaration in *A.C. Strip* that the insurance clause is unambiguous is "mere dicta," and thereby, this Court does not have to accept that declaration. However, this Court disagrees. The statement in *A.C. Strip* that the insurance clause is unambiguous is necessary to the holding. If, instead, the *A.C. Strip* Court had found that the clause was ambiguous, the Court would have liberally construed the clause in favor of the insured (the law firm) so that the insured would be covered.

Furthermore, case law from other courts also supports that the term "related" is unambiguous. The Eastern District of Michigan in the Sixth Circuit has acknowledged that the term "related" is commonly understood. *See Sigma Fin. Corp. V. Am. Int'l Speciality Lines Ins.*,

200 F.Supp.2d 697, 706 (E.D. Mich. 2001). In addition, numerous other federal courts outside this circuit have found that "related" is not ambiguous. *See Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989); *St. Paul Fire and Marine Ins. Co. v. RWR Mgmt., Inc.*, No. CV-05-0294-EFS, 2006 WL 3289772, at *4 (E.D. Wash. Nov. 13, 2006); *see also Con'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262 (11th Cir. 2000) (the words "relate" or "related" are commonly understood terms in everyday usage); *Gateway Group Advantage, Inc. v. McCarthy*; 300 F.Supp.2d 236, 245 (D. Mass. 2003) (there is a "common sense understanding" of the term "related"); *Nat'l Union Ins. Co. of Pittsburgh v. Holmes & Graven*, 23 F.Supp.2d 1057, 1070 (D. Minn. 1998) ("although 'related' is a commonly used word with a broad meaning which encompasses a myriad of relationships, multiple or broad meanings do not necessarily create ambiguity").

Coffman cites to the case of, *St. Paul Fire & Marine Ins. Co. v. Chong*, 787 F.Supp. 183 (D. Kan. 1992) which states that as "related" has "no accepted legal definition," this allows the phrase "series of related wrongful acts" to be construed in many different ways. *Id.* at 187. However, this case does not follow the law of Ohio, which states that terms are construed according to their *commonly accepted meaning*. It is no requirement that the term has a legal definition. Many of the other cases cited by Coffman are irrelevant for various reasons and do not support his supposition that "related" is ambiguous.[1]

---

[1] Several cases address the meaning of the term "interrelated." *See The Fed. Sav. and Loan Ins. Corp. v. Burdette*, 718 F.Supp. 649, 657-59 (E.D. Tenn. 1989); *Stauth v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 97-6437, 97-6438, 1999 WL 420401, at *7-8 (10th Cir. June 24, 1999); *Nat'l Union Fire Ins. Co. V. Ambassador Group, Inc.,* 691 F. Supp. 618, 623 (E.D. N.Y. 1988). The term "interrelated," is more restrictive than the term "related." *See Sigma Fin.*, 200 F.Supp.2d at 704. In *Admiral Ins. Co., Inc. v. Briggs*, 264 F.Supp.2d 460 (N.D. Tex. 2003) "related wrongful acts" is defined in the policy as "logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision"; therefore, it was not open to the court's interpretation as it was specifically defined. *Id.* at 463. In *Scott,* the court acknowledged that courts have disagreed on the definition of "related" but the court did not hold that the term "related" is ambiguous or that it must be strictly

If there is any ambiguity in the case before this Court, it is not the result of the language being, per se, ambiguous, but rather the result of Coffman proposing a definition in an effort to limit the "Multiple Insured's Clause's" coverage. *See Feldkamp v. USAA Ins. Co.*, 743 N.E.2d 405, 409 (Ohio App. 11 Dist. 2000). Through this proposed definition, Coffman, attempted to create "a second definition apart from the ordinary meaning of the language, hence creating ambiguity where perhaps there was none." *See id.*

> [T]he terms related, series, claims, even fact, can be ambiguous in a vacuum because there are so many different contexts for these general terms . . . [and ] at some point . . . a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play. . . . However, if the rule construing an ambiguous term in an insurance policy against the insurer were mechanically applied to such terms, they would be rendered meaningless in all contracts for all insurance.

*Highwoods Properties, Inc. v. Executive Risk Indem., Inc.*, No. 03-0077-CV-W-NKL, 2004 WL 4986355, at *9 (W.D. Mo. May 11, 2004) (internal citations omitted).

Therefore, based on the rules of interpretation under Ohio law, the precedent of *A.C. Strip*, and other federal case law, this Court finds that the term "related" is unambiguous. Interpretation of the "Multiple Insureds Clause" is appropriate for summary judgment and the word "related" must be interpreted according to its commonly accepted meaning.

## 2. Commonly Accepted Meaning

If a term is not defined in an insurance policy, the term is "accorded its commonly understood meaning." *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 956 (6th Cir. 2006). According to "Insurance Claims and Disputes" in the A.L.R. library, "'Related' is a common word used in liability insurance policies and should be held to mean 'in connection

---

construed against the insurer. 216 F.Supp.2d 689.

with, associated with.'" Allan D. Windt, Annotation, *Interpretation of Important Policy Provisions: "Related" Language*, INCD § 1122:D. There is no requirement that a dictionary definition be used; however, "[d]ictionary definitions can aid in determining a term's plain and ordinary meaning." *Stiriz v. Motorists Mut. Ins. Co.*, No. F-01-010, 2002 WL 479826, at *6 (Ohio App. 6 Dist. Mar. 29, 2002).

The Ohio State Supreme Court has used Webster's Dictionary and Black's Law dictionary to determine the definition of a word in a contract. *See U.S. Fid. & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, 687 N.E.2d 717, 719 (Ohio 1997) (using Webster's and Black's dictionary for the definition of "fee"). According to Black's Law Dictionary, (5th Ed. 1979), "related" means "[s]tanding in relation; connected; allied; akin." Merriam-Webster Online Dictionary (2008), defines "related" as "connected by reason of an established or discoverable relation," and defines "relation" as "an aspect or quality (as resemblance) that connects two or more things or parts as being or belonging or working together or as being of the same kind." Webster's Third New International Dictionary (1981) defines "related" as "having relationship: connected by reason of an established or discoverable relation," and defines "relation" as "an aspect or quality (as resemblance, direction, difference) that can be predicated only of two or more things taken together: something perceived or discovered by observing or thinking about two or more things at the same time: connection."

In *A.C. Strip*, the Court did not specifically define the term "related." The Court found, however, that later filed cross-claims will relate back to the original claim for purposes of a liability insurance policy if "the basis for the cross-claims is the events and occurrences that formed the basis for the [original] claims." *See* 868 F.2d at 188. Pursuant to this, a claim and

cross-claim would be related if the same events and occurrences formed the basis for both claims. This Court acknowledges that this statement of the Sixth Circuit is dicta, as the cross-claims were not before the *A.C. Strip* Court. As this is the only Sixth Circuit law on this point, this Court finds its dicta both persuasive and instructive.

Many federal courts have held that the common understanding of the word "related" covers "a very broad range of connections, both causal and logical." *Gregory*, 876 F.2d at 606; *St. Paul Fire*, 2006 WL 3289772 at *4; *RLI Ins. Co. v. Conseco, Inc.*, --- F.3d ----, 2008 WL 4140620, at *5 (7th Cir. Sept. 9, 2008); *Wendt*, 205 F.3d at 1262-63; *Homes & Graven*, 23 F.Supp.2d at 1070; *Fed. Deposit Ins. Corp. v. Mmahat*, 907 F.2d 546, 553 (5th Cir. 1990); *Argent Fin. Group, Inc. v. Fid. and Deposit Co. of Maryland*, No. Civ.A.04-2323, 2005 WL 2304515, at *8 (W.D. La. Sept. 21, 2005); *see Sigma Fin.*, 200 F.Supp.2d at 704 ("many situations may be "related"-connected . . ."). That acts may result in a "number of different harms to different persons, who may have different types of causes of action against the attorney does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract." *Wendt*, 205 F.3d at 1264; *but see Argent*, 2005 WL 2304515 at *8 (finding that claims were not related as they occurred at different periods of time, involved different customers and transactions, and different instances of wrongdoing). However, the word "related" does not encompass "every conceivable logical relationship." *Homes & Graven*, 23 F.Supp.2d at 1070. "A relationship between two claims might be so attenuated or unusual that an objectively reasonable insured could not have expected that they would be treated as a single claim under the policy." *Id.* (internal citations omitted); *see Highwoods*, 2004 WL 4986355 at *9 (at some point "a logical connection may be too tenuous reasonably to be called a relationship").

Coffman primarily relies on, *Scott*, which interpreted "related" based on analogy to cases outside the circuit. *See* 216 F.Supp.2d at 695. The court determined that the case before it was "more analogous to those cases [outside the circuit] that apply the separate duty and distinct harm approach." *Id.* Using that approach, the *Scott* court looked to whether the attorney "owed separate and distinct duties" to the claimants, and whether the attorney's breach resulted in "different and discrete harms." *Id.* However, under Ohio law,

> absent some special circumstance, such as a contractual definition, or a commercial or technical meaning acquired by usage and intended to be used by the parties, or a special meaning manifested in the contractual context, the entire policy must be considered and construed in a fashion which accords words and phrases therein their *natural and usual meaning.*

*Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1351 (Ohio 1982) (emphasis added); *see also King*, 519 N.E.2d at 1384 ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument"). The natural and usual meaning of "related" is not "same duty and same harm." This Court finds that the *Scott* court's interpretation of the word "related" was not in accord with the "natural and usual meaning," of the word.

Based on the rules of interpretation under Ohio law, the definitions of "related" in the A.L.R. and dictionaries relied upon by the Ohio Supreme Court, and federal case law, this Court finds that the term "related" covers a very broad range of connections, both causal and logical, but does not cover connections that would be objectively unreasonable to treat as related because they are so attenuated or unusual.

**B. Application of "Related" to Class Action Complaint and Malpractice Claim**

Applying the established definition of "related," if the Class Action complaint and the Malpractice Claim are either logically or causally connected, and that connection is not so attenuated or unusual so as to make it objectively unreasonable to treat those claims as related, then those claims will be treated as a single claim.

The liability of Coffman in the Class Action complaint was based on three allegations. First, Coffman failed to register the transfer of ownership of DBS and the right to use the fictitious name with the secretary of state. Second, Coffman regularly signed and filed pleadings to commence and maintain civil actions on behalf of DBS for the purpose of collecting consumer debts allegedly owed third parties. Third, Coffman appeared as counsel for DBS and Dickerson in Zanesville Municipal Court and refused voluntarily to dismiss and/or to vacate the debt collection judgment taken against the Fosters.

The Malpractice Claim is based on three allegations relating to Coffman's breach of his duties as the lawyer for Dickerson and DBS. First, Coffman breached his duties by failing to register the transfer ownership of DBS and the right to use the fictious name with the secretary of state. Second, Coffman breached his duties by failing to advise Dickerson to obtain assignments from creditors prior to filing suit. And third, Coffman breached his duties by failing to inform Dickerson of the potential for conflicts of interest in representing both Dickerson and DBS. The Malpractice Claim asserts that as a result of the legal malpractice, Dickerson and DBS incurred liability to the class members in the Class Action.

Therefore, the basis of the Class Action complaint and the Malpractice Claim is the same event: the legal malpractice of failing to register DBS. *See also A.C. Strip*, 868 F.2d at 188 (cross-claims will relate back to the original claim for purposes of a liability insurance policy if

"the basis for the cross-claims is the events and occurrences that formed the basis for the [original claims]"). It was Dickerson's reliance on Coffman's registration of DBS and her reliance that she did not need to obtain assignments prior to filing suit that led Dickerson to be sued by the class members, for collecting or attempting to collect consumer debts through an unincorporated proprietorship, and then failing dismiss or vacate the void and illegal debt collection judgment. If Coffman had properly performed his legal services, then there would have been no basis for the Class Action complaint because the debt collection actions would have been legal.

When Westport and Coffman received notice that the Class Action complaint had been filed, the complaint notified them that in addition to Coffman being sued, Coffman's clients, DBS and Dickerson, were being sued because of legal services Coffman performed for his clients. Therefore, it should have been no surprise to Westport or Coffman that DBS and Dickerson would later bring a cross-claim alleging legal malpractice in performance of those services. "[T]he intent of [the multiple insured's clause] provision is to relate subsequent claims, based on an initial claim, back to the initial claim so that the insurer is not liable to the limits of the policy on both claims." *Id.* at 190.

Therefore, this Court finds that the Class Action complaint and the Malpractice Claim are logically connected. The relationship here is not so attenuated or unusual that it would be objectively unreasonable to treat the claims as related. Pursuant to the "Multiple Insureds Clause," these two claims arise out of a series of related wrongful acts, and thereby constitute a single claim under a single policy. The Malpractice Claim hence relates back to the date the earlier Class Action complaint was filed, May 30, 2001. Accordingly, as a single claim under the

2000-01 Policy, these actions are subject to the single per-claim limit liability of $500,000. The remaining per-claim limit of liability is $50,000 since $450,000 of the 2000-01 Policy's $500,000 per-claim limit of liability was paid in the settlement of the Class Action.

## V. CONCLUSION

For the foregoing reasons, this Court **GRANTS** Plaintiff's Partial Motion for Summary Judgment on the issue of whether the Class Action complaint and Malpractice Claim constitute a single claim, and **DENIES** Defendant's Motion for Summary Judgment on that same issue. The remaining issues in Plaintiff's and Defendant's Motions for Summary Judgment are **DISMISSED** as moot.

**IT IS SO ORDERED.**


    <u>  s/Algenon L. Marbley         </u>
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: January 29, 2009**